IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEVEN TIMOTHY KYLE | CRIMINAL ACTION<br><br>NO. 25-122-KSM |

**MEMORANDUM**

**Marston, J.**                                                                                           **May 28, 2025**

      Before the Court is Defendant Steven Timothy Kyle's appeal of the pretrial detention order of United States Magistrate Judge Carol Sandra Moore Wells. (Doc. No. 18.) Following Defendant's detention hearing on April 7, 2025, Judge Wells granted the Government's motion for pretrial detention, finding that there was no combination of conditions that could assure the safety of others in the community. (Doc. Nos. 8, 12.) On May 7, 2025, Defendant appealed Judge Wells's pretrial detention order and moved for release. (Doc. No. 18.) At the Court's direction, the Government filed its opposition to his appeal on May 14, 2025. (Doc. Nos. 19, 23.) The Court held a hearing on the motion on May 20, 2025. (Doc. No. 19.) For the reasons stated by the Court in denying the motion during the hearing, and for the reasons set forth below, the Court denies Defendant's motion for release and affirms Judge Wells's pretrial detention order.

**I.      Standard of Review**

      This Court has jurisdiction to review Judge Wells's pretrial detention order under 18 U.S.C. § 3145(b). *See* 18 U.S.C. § 3145(b) ("If a person is ordered detained by a magistrate judge, . . . the person may file, with the court having original jurisdiction over the offense, a

motion for revocation or amendment of the order."). This Court is required to conduct a *de novo* review of a magistrate judge's ruling. *See United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). In conducting this review, the Court may rely on the transcript of the proceeding before the magistrate judge. *Id.* at 1395 n.3; *see also See United States v. Carroll*, No. CR 24-246-KSM-1, 2024 WL 4336729, at *1 (E.D. Pa. Sept. 27, 2024) ("The district court may rely on the evidence in the record of proceedings before the magistrate judge, or in its discretion, choose to hold an evidentiary hearing if the court determines it would be necessary or useful in its determination.") (internal quotations omitted)).

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, governs the pretrial detention of federal defendants. The Act provides that, "[i]f, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). In making this determination, the Court considers the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> > (a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release

> pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*Id.* § 3142(g). "Where danger to the community is at issue, the Government must prove that no condition or combination of conditions will reasonably assure the safety of any other person and the community by clear and convincing evidence." *United States v. Adams*, No. 2:24-CR-164-2, 2025 WL 1003023, at *3 (W.D. Pa. Apr. 3, 2025).

**II.     Findings of Fact**

The Court makes the following findings of fact with respect to pretrial detention:

**A.     The Underlying Conduct**

1. On March 27, 2025, a federal grand jury returned a bill of indictment charging Defendant with three counts of: (1) interstate stalking, in violation of 18 U.S.C. §§ 2261A(1)(B) and 2261(b)(5); (2) cyberstalking, in violation of 18 U.S.C. §§ 2261A(2)(B) and 2261(b)(5); and (3) sending threatening communications, in violation of 18 U.S.C. § 875(c). (Doc. No. 1.) In Count One, the indictment alleges that from in or about March 2024 to August 2024, Defendant traveled in interstate commerce to Doylestown, Pennsylvania, with the intent to injure, harass, intimidate, and place under surveillance A.O., and in the course of and as a result of such travel caused, attempted to cause, and would reasonably expect to cause, substantial emotional distress to A.O. (*Id.* at 1.) In Count Two, the indictment charges Defendant with using an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and a facility of interstate and foreign commerce to engage in a course of conduct, with the intent to injure, harass, and intimidate A.O, including sending electronic messages that threatened A.O., that caused, attempted to cause, and would be reasonably

3

expected to cause substantial emotional distress to A.O., from in or about March 2024 to September 2024. (*Id.* at 2.) Count Three alleges that Defendant knowingly, with the knowledge that the communication would be viewed as a threat and for the purpose of issuing a threat, transmitted in interstate commerce an electronic communication to A.O., which contained a threat to injure and kill A.O. on or about September 5, 2024. (*Id.* at 3.)

      2.    The parties agree that approximately twenty years ago, Defendant dated A.O. after meeting at a summer internship program.[1] (Doc. No. 23 at 4.) Shortly after their relationship ended, A.O. drove to Defendant's apartment in Camden, New Jersey to return his laptop. (*Id.*) While A.O. was waiting in her car outside his apartment, Defendant shattered the passenger-side window, sending shards of glass into A.O.'s face. (*Id.*) Defendant was charged with assault, but the charges were withdrawn in exchange for his agreement to pay A.O.'s hospital bills. (*Id.*) From 2004 until 2023, Defendant had no further contact with A.O. (*Id.*) At some point after 2004, Defendant moved to Virginia and started working for Lockheed Martin, where he was employed for over two decades. (*Id.* at 31–32.)

      3.    The Government's evidence in this case appears to be strong. The Government alleges that on A.O.'s birthday in April 2024, Defendant delivered a gift-wrapped package to A.O.'s neighbor's house in Doylestown, Pennsylvania. (*Id.*) The packaged was addressed to A.O. and contained a bottle of Drano, a paper cup with a lemon, a bottle of Bombay Saphire gin, and a package of bed bug traps. (*Id.* at 4.) Attached to the package was a note addressed to A.O., which said "I'll never settle." (*Id.*) That same day, Defendant activated a GPS tracker that was later located on the undercarriage of A.O.'s fiancé's car. (*Id.*) The next day, Defendant

---

[1] The Government describes Defendant's relationship with A.O. as "casual." (Doc. No. 23 at 4.) But during the hearing on May 20, 2025, defense counsel objected to that description of their relationship, claiming that Defendant had dated A.O. for four years and lived with her for approximately three years.

texted A.O. to encourage her to commit suicide, writing, "In all seriousness the draino really is your best option at this point. . . . Any other future scenario for you is bleak as hell. This way there would be fewer victims (not that you care about that part)." (*Id.* at 5.) Defendant followed up twice to tell A.O. to commit suicide and to complain that she refused to kill herself. (*Id.*)

    4. Additionally, the Government alleges that on August 8, 2024, Defendant purchased various seafood items at a grocery store about 40 minutes away from A.O.'s home. (*Id.*) Soon thereafter, A.O. found pieces of raw octopus and smashed fruit outside her home. (*Id.*) And on August 9, 2024, Defendant purchased root killer from an Ace Hardware store about five miles away from A.O.'s house. (*Id.*) The next day, A.O. opened her door to find a severed fish head on her front porch, and the police were called. (*Id.*) The police observed a white, powdery substance on her lawn, which had killed her grass. (*Id.*) The dead grass appeared to spell out the word, "SLUT." (*Id.*)

    5. The following week, Defendant checked into a hotel around 9 miles from A.O.'s residence. (*Id.*) On August 18, 2024, A.O. discovered that manure and sulfuric acid had been thrown onto her car, which caused her car's paint to peel and produced a chemical odor from it. (*Id.* at 5–6.) A.O. also found a .223 round on her front windshield. (*Id.* at 6.) That night, Defendant texted her that he was in her home with her cats who were not "looking good now." (*Id.*) A.O.'s car was brought to a local body shop, and the mechanics who serviced it experienced irritation to their skin from the chemicals on the vehicle. (*Id.*) The acid caused discoloration, rust, and such significant damage that A.O.'s car was declared to be totaled. (*Id.*) The mechanics also discovered two GPS trackers on the undercarriage of A.O.'s car and another tracker on her fiancé's car, which were registered to Defendant. (*Id.*)

6. In addition to traveling from Virginia to Pennsylvania to stalk A.O., the Government alleges that Defendant also created a fake social media account for A.O., fake e-mails using the victim's identifiers, and sent emails and texts to A.O. from March through September 2024. (*Id.*) What began as rambling insults escalated to specific threats against A.O.'s life and the lives of others. (*Id.*) On May 15, 2024, A.O. warned Defendant that she was reporting him to the police, but the threatening messages from Defendant did not stop. (*Id.*) And when A.O. blocked Defendant's number, he created a new phone number and resumed his barrage of terrorizing messages. (*Id.*) For example, on September 3, 2024, Defendant sent A.O. the following messages:

- The real suffering will start soon. You won't be surviving. Figured I'd be blunt since you're a man now.

- It shouldn't have been so easy for you to hurt me with such extreme indifference. I'm gonna hurt you so much worse now. You earned this. There is no way out.

- Everyone around you dies

(*Id.* at 6–7.) Two days later, Defendant sent the victim the followings texts:

- It shouldn't have been so easy for you to hurt me with such extreme indifference. I'm gonna hurt you so much worse now. You earned this. There is no way out.

- Everyone around you dies.

- Ur time is up. Only way to stop is suicide. You won't do that, so you're gonna be killed slowly.

- Hey there cunt. I have to give phone back so this is it. I sent the 17 sms to trick GPS to that's enough. I wanna tell you a secret though. I don't care about the list. I'm jumping right to you and I'm gonna enjoy it. You don't get to do what you did and live on. Hahahaha. I'll see you soon bitch. Everyone around you dies

(*Id.* at 7.)

7. On September 9, 2024, law enforcement executed a search warrant at Defendant's home in Herndon, Virginia. (*Id.*) Law enforcement seized a shotgun, two rifles, two silencers,[2] two handguns, and six handgun lowers from his home.[3] (*Id.*) They also found numerous types of chemicals, including sulfuric acid,[4] and seized several cell phones and other electronic devices. (*Id.* at 8.) Through the seized devices and Defendant's internet account, law enforcement accessed the email addresses that Defendant created to harass A.O. (*Id.* at 8–9.) Plus, law enforcement seized a number of hotel receipts and records that showed Defendant had driven his rental cars in and around A.O.'s city of residence when her home and car were vandalized. (*Id.* at 9.)

### B.   Defendant's Background

1. Since approximately April 2018, Defendant has lived by himself in a home that he owns in Herndon, Virginia. (April 7, 2025 Pretrial Services Report ("PTSR") at 1.) Defendant represents that he has substantial family ties in the Virginia area, including his sister, with whom he maintains regular communication and who was able to verify information for the Pretrial Services Officer. (*Id.* at 2–4.) Defendant is not married and has no children. (*Id.* at 1.) Though he has no criminal convictions, Defendant has some limited prior contact with the criminal

---

[2] On March 19, 2025, the Eastern District of Virginia issued a federal arrest warrant charging Defendant with possessing two unregistered silencers, in violation of 26 U.S.C. § 5861(d). (*Id.* at 7.)

[3] The .223 round of ammunition left on A.O.'s car windshield is consistent with at least one of the firearms found at Defendant's residence. (*Id.* at 7.)

[4] "Alcohol, Tobacco, Firearm, and Explosives (ATF) Special Agent and Bomb Technician Steven Letteney observed many labeled chemicals and electronic parts that could be a precursor for explosives and/or explosive devices, if used by someone with the necessary knowledge." (*Id.* at 8.)

justice system, including the domestic violence incident in which A.O. was injured.[5] (*Id.* at 14–15.)

      2. At the time of the criminal conduct alleged in the indictment, Defendant worked at Lockheed Martin as a "Cyber Intelligence Analyst Manager." (Doc. No. 23 at 9.) In this role, he solved complex problems related to "computer network defense . . . and computer forensics," and he detected, alerted, and responded to "malicious network activity originating from external and internal threat actors." (*Id.*) Defendant worked for Lockheed Martin for over 20 years.[6] (*Id.* at 32–33.) At times in 2024, Defendant would travel to Lockheed Martin's office in King of Prussia, Pennsylvania. (*Id.*)

      3. Defendant is a sophisticated user of cyber tools. (*Id.*) The Government alleges that in order to facilitate his criminal conduct in this case, Defendant used a paid subscription mobile application ("app") that collects data on WiFi access points, which in turn could be used to hack another person's WiFi network. (*Id.*) Based on a forensic analysis of one of the seized devices from Defendant's home, law enforcement discovered that Defendant had used this app in A.O.'s neighborhood. (*Id.* at 9–10.) The app revealed that Defendant signed up using a fake email address under A.O.'s name and made his username A.O.'s name. (*Id.* at 10.) He also used anti-detect and anti-forensic tools, which concealed his internet activity and blocked metadata. (*Id.*) Last, Defendant had a password cracking tool called "Hashcat" on multiple electronic devices. (*Id.*)

---

[5] On December 13, 2024, it appears that Defendant was arrested by the Camden Police Department and charged with simple assault. (PTSR at 3.) This case was dismissed on February 14, 2025. (*Id.*)

[6] Defendant reported to Pretrial Services that he earned $245,000 annually at the time of his arrest and had a net worth of over $1,200,000.00. (PTSR at 2.)

      4. A.O. reported Defendant's threats and harassment to local law enforcement and in late August 2024, Defendant was charged in Bucks County, Pennsylvania for criminal mischief, terroristic threats, stalking, and harassment. (Doc. No. 18 at 2.) He voluntarily surrendered himself at the Central Bucks Police station soon thereafter. (*Id.*) In September 2024, as part of negotiations between the Commonwealth and Defendant's counsel, Defendant was released on bail with certain conditions. (*Id.*) Defendant was placed on a GPS unit and ordered to attend an in-patient mental health treatment program.[7] (*Id.*) Additionally, Defendant was ordered to have no contact with A.O. and her family. (Doc. No. 23 at 2.)

      5. On February 20, 2025, Bucks County Pre-Trial Services filed a petition to revoke Defendant's bail because A.O. had received an email from steve.kyle@gmail.com, which said "I'm ready to engage. What is going on? Please ping." (*Id.* at 20.) A state judge signed an arrest warrant for Defendant on February 28, 2025, and Defendant was arrested at his home in Virginia that same day. (*Id.* at 3.)

## III.   Procedural History

Before a state hearing could be held on his alleged violation of bail conditions, Defendant was federally indicted and transferred into federal custody. (Doc. No. 23 at 3.) On April 7, 2025, a pretrial detention hearing was held before Judge Wells. (Doc. No. 9.) Judge Wells reviewed the alleged criminal conduct as well as Defendant's previous violation of the no-contact order. (Doc. No. 23 at 24–34.) Judge Wells found that Defendant is not a flight risk but

---

[7] Though Defendant's medical records were not provided, defense counsel stated during the hearing on May 20, 2025, that Defendant was diagnosed with depression, anxiety and post-traumatic stress disorder while attending the in-patient mental health treatment program. Defendant successfully completed the in-patient mental health treatment program and returned to his home in Virginia with GPS monitoring. (Doc. No. 18 at 3.) In Virginia, Defendant continued to work with a therapist. (*Id.*)

Defendant also reported to Pretrial Services that he has a history of alcohol dependance and attends Alcoholics Anonymous classes to address his addiction concerns. (PTSR at 3.)

expressed grave concern about Defendant's "inability to stay away from the alleged victim, even if not directly, by cyber contact and/or sending packages or messages to her." (*Id.* at 34.) She thus ordered his detention until the time of trial and ordered that he have no contact with victim or family. (*Id.*; Doc. No. 11.)

On May 7, 2025, Defendant appealed Judge Wells's pretrial detention order. (Doc. No. 18.) In the appeal, Defendant argues that he is not a danger to society because he was "compliant on bail for a period of seven months." (*Id.* at 4.) He also says that that he is not dangerous because there is no proof that he authored the email to A.O., but even if he did write the email, it was not a serious pretrial release violation because it was nonthreatening.[8] (*Id.* at 5.) And he insinuates that the Government does not think he is dangerous because it permitted "9 days to lapse prior to arresting him." (*Id.*) He thus asks the Court to release him pending trial and suggests that the Court could place additional conditions on his release to ensure community safety, such as an updated mental health evaluation, restrictions on internet usage, banning use of a smartphone, or an increase of his bail amount. (*Id.* at 6.)

The Government opposes Defendant's appeal and motion for release. (Doc. No. 23.) It argues that Defendant has stalked and terrorized his ex-girlfriend for months, which demonstrates his dangerousness to A.O. and her family. (*Id.* at 1–2.) The Government highlights that there is no condition of release to ensure community safety because Defendant has shown a disregard for the state court's no-contact order. (*Id.* at 13–14.) Given Defendant's background in cybersecurity as well as his use of sophisticated cyber tools as part of the alleged

---

[8] At the hearing on May 20, 2025, Defendant conceded that he authored this email because his counsel argued that he used his own email address to send the message and thus he was not trying to conceal his identity.

criminal conduct, the Government further reasons that Defendant could find a way to contact A.O. and continue his campaign of terror against her if he was released. (*Id.* at 14.)

## IV.    Discussion

Based on the relevant § 3142(g) factors, the Court finds that there is no condition or combination of conditions of Defendant's release that will ensure the safety of the community.

As to the first factor, the nature and circumstances of the offense charged, the Court finds that the nature and circumstances of these serious offenses weigh in favor of detention. Defendant has been charged with interstate stalking, interstate cyberstalking, and sending threatening communications. (Doc. No. 1.) The Government proffers evidence that as part of a campaign to stalk, threaten, and terrorize A.O. and her family, Defendant left A.O. a suicide kit, threatened to kill her and everyone she knows, and destroyed her car with acid. (Doc. No. 23 at 4–7.) These serious offenses carry a maximum imprisonment of 15 years, a minimum 3-year term of supervised released, a $750,00 fine, restitution, and a $300 special assessment. (*Id.* at 14.) That said, the Court also notes that his sentencing guidelines range is 33 to 41 months' imprisonment. (*Id.*) So while the Court does not find that Defendant is a flight risk, the nature and circumstances of the offenses charged show that Defendant is a threat to the community, specifically A.O. and her family.

As to the second factor, the weight of the evidence against the person, while Defendant is presumed innocent, the Court finds that the Government's evidence is strong. Defendant's electronic devices provide evidence of his stalking and threatening of A.O. and her family. (*Id.* at 14.) He also used sophisticated means to track the victim and her fiancé by putting GPS locaters on their cars. (*Id.*) Plus, his use of the WiFi mobile app to identify weak spots in the

victim's WiFi network demonstrates the lengths he would go in order to further stalk, harass, and threaten the victim.

Third, considering the history and characteristics of Defendant, Defendant clearly possesses substantial skills in cybersecurity and technology, which allowed him to maintain steady employment at Lockheed Martin for over two decades. Yet it appears that he used this knowledge to stalk, cyberstalk, and threaten A.O., including driving by her house to collect data from her WiFi network. (*Id.* at 9–11.) The Court recognizes that Defendant has no prior criminal convictions and strong family ties to Virginia. (Doc. No. 18 at 5.) But the Court does not find this is enough to ameliorate against Defendant's danger to the community, in particular as to A.O. and her family. *See United States v. Thompson*, No. 4:16-CR-00019-19, 2018 WL 447331, at *5 n.50 (M.D. Pa. Jan. 17, 2018) ("Community ties have limited weight in the context of assessing whether a defendant presents a danger to the community.").

Additionally, the Court cannot ignore the fact that Defendant violated the state court's no-contact order, which was imposed as a condition of his pretrial release. Defendant tries to downplay the severity of this violation because he claims it was a "nonthreatening email." (Doc. No. 18 at 5.) But based on Defendant's prior alleged messages to A.O., the Court cannot find that the message "I'm ready to engage. What is going on? Please ping." was benign. This message was sent in violation of a no-contact order and could be viewed by the victim as part of a continued campaign to harass her and her family. Indeed, Judge Wells relied on this fact to order pretrial detention in this case. (*See* Doc. No. 23 at 34 ("What I found troubling is his inability to stay away from the alleged victim, even if not directly, by cyber contact and/or by sending packages or messages to her.").) The Court agrees with Judge Wells's reasoning and conclusion. *See United States v. Robertson*, No. CR 18-264, 2022 WL 1270954, at *7 (W.D. Pa.

Apr. 28, 2022) (ordering pretrial detention, in part, because defendant violated a state no-contact order).

Finally, as to the fourth § 3142(g) factor, the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release, the Court finds that Defendant poses a significant danger to the community if released. During the execution of a search warrant at Defendant's home in September 2024, law enforcement seized a shotgun, two rifles, two silencers, two handguns, and six handgun lowers at his house. (Doc. No. 23 at 7–9.) They also found numerous types of chemicals, including sulfuric acid and electronic parts that could be a precursor for explosives and/or explosive devices if used by someone with the necessary knowledge. (*Id.*) Coupled with his well-documented threats to kill A.O. and everyone around her, this evidence shows that Defendant poses a significant danger to the community if he were to be released. Nor is the Court persuaded that electronic monitoring and home confinement would limit his danger to the community because "electronic monitoring and home confinement do not guarantee that [a] defendant will not . . . endanger the community." *United States v. Abdullahu*, 488 F. Supp. 2d 433, 444 (D.N.J. 2007). Defendant's expertise in cybersecurity and his sophistication with cyber tools also weigh against his release back into the community, where he could quickly gain access to such tools to continue his conduct against A.O. and her family. Last, Defendant's significant financial resources would enable him to purchase additional cyber tools as well as weapons, electronic devices, or even explosives.

\* \* \*

For these reasons, the Court finds that there is no condition or combination of conditions that will reasonably protect the safety of the community if Defendant was released.

## V.     Conclusion

For the foregoing reasons as well as the reasons stated in open court on May 20, 2025, the Court denies Defendant's motion for release and affirms the pretrial detention order. An appropriate Order follows.