IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN TIMOTHY KYLE,<br><br>Defendant. | CRIMINAL ACTION<br><br>No. 25-cr-122-KSM |

MEMORANDUM

**MARSTON, J.** January 5, 2026

  Defendant Steven Timothy Kyle wants to be released from pre-trial custody. Back in May 2025, Defendant appealed the Magistrate Judge's pretrial detention order. The Court held an evidentiary hearing and carefully considered the merits of the Defendant's application for release. Based on the relevant § 3142(g) factors, the Court found that there was no condition or combination of conditions of Defendant's release that would ensure the safety of the community. Now, Defendant again moves for reconsideration of his pretrial detention. (Doc. No. 40.) For the reasons discussed below, Defendant's motion is denied.

**I.  BACKGROUND**

  The Court restates the findings of facts in this case, as entered in the Court's May 28, 2025, Memorandum. (*See* Doc. No. 29.)

  **A.  The Underlying Conduct**

   1. On March 27, 2025, a federal grand jury returned a bill of indictment charging Defendant with three counts of: (1) interstate stalking, in violation of 18 U.S.C. §§ 2261A(1)(B) and 2261(b)(5); (2) cyberstalking, in violation of 18 U.S.C. §§ 2261A(2)(B) and 2261(b)(5); and (3) sending threatening communications, in violation of 18 U.S.C. § 875(c).

(Doc. No. 1.)  In Count One, the indictment alleges that from in or about March 2024 to August 2024, Defendant traveled in interstate commerce to Doylestown, Pennsylvania, with the intent to injure, harass, intimidate, and place under surveillance A.O., and in the course of and as a result of such travel caused, attempted to cause, and would reasonably expect to cause, substantial emotional distress to A.O.  (*Id.* at 1.)  In Count Two, the indictment charges Defendant with using an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and a facility of interstate and foreign commerce to engage in a course of conduct, with the intent to injure, harass, and intimidate A.O, including sending electronic messages that threatened A.O., that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to A.O., from in or about March 2024 to September 2024.  (*Id.* at 2.)  Count Three alleges that Defendant knowingly, with the knowledge that the communication would be viewed as a threat and for the purpose of issuing a threat, transmitted in interstate commerce an electronic communication to A.O., which contained a threat to injure and kill A.O. on or about September 5, 2024.  (*Id.* at 3.)

       2.    The parties agree that approximately twenty years ago, Defendant dated A.O. after meeting at a summer internship program.[1]  (Doc. No. 23 at 4.)  Shortly after their relationship ended, A.O. drove to Defendant's apartment in Camden, New Jersey to return his laptop.  (*Id.*)  While A.O. was waiting in her car outside his apartment, Defendant shattered the passenger-side window, sending shards of glass into A.O.'s face.  (*Id.*)  Defendant was charged with assault, but the charges were withdrawn in exchange for his agreement to pay A.O.'s hospital bills.  (*Id.*)  From 2004 until 2023, Defendant had no further contact with A.O.  (*Id.*)  At

---

[1] The Government describes Defendant's relationship with A.O. as "casual."  (Doc. No. 23 at 4.)  But during the hearing on May 20, 2025, defense counsel objected to that description of their relationship, claiming that Defendant had dated A.O. for four years and lived with her for approximately three years.

some point after 2004, Defendant moved to Virginia and started working for Lockheed Martin, where he was employed for over two decades. (*Id.* at 31–32.)

        3. The Government's evidence in this case appears to be strong. The Government alleges that on A.O.'s birthday in April 2024, Defendant delivered a gift-wrapped package to A.O.'s neighbor's house in Doylestown, Pennsylvania. (*Id.*) The packaged was addressed to A.O. and contained a bottle of Drano, a paper cup with a lemon, a bottle of Bombay Saphire gin, and a package of bed bug traps. (*Id.* at 4.) Attached to the package was a note addressed to A.O., which said "I'll never settle." (*Id.*) That same day, Defendant activated a GPS tracker that was later located on the undercarriage of A.O.'s fiancé's car. (*Id.*) The next day, Defendant texted A.O. to encourage her to commit suicide, writing, "In all seriousness the draino really is your best option at this point. . . . Any other future scenario for you is bleak as hell. This way there would be fewer victims (not that you care about that part)." (*Id.* at 5.) Defendant followed up twice to tell A.O. to commit suicide and to complain that she refused to kill herself. (*Id.*)

        4. Additionally, the Government alleges that on August 8, 2024, Defendant purchased various seafood items at a grocery store about 40 minutes away from A.O.'s home. (*Id.*) Soon thereafter, A.O. found pieces of raw octopus and smashed fruit outside her home. (*Id.*) And on August 9, 2024, Defendant purchased root killer from an Ace Hardware store about five miles away from A.O.'s house. (*Id.*) The next day, A.O. opened her door to find a severed fish head on her front porch, and the police were called. (*Id.*) The police observed a white, powdery substance on her lawn, which had killed her grass. (*Id.*) The dead grass appeared to spell out the word, "SLUT." (*Id.*)

5. The following week, Defendant checked into a hotel around 9 miles from A.O.'s residence. (*Id.*) On August 18, 2024, A.O. discovered that manure and sulfuric acid had been thrown onto her car, which caused her car's paint to peel and produced a chemical odor from it. (*Id.* at 5–6.) A.O. also found a .223 round on her front windshield. (*Id.* at 6.) That night, Defendant texted her that he was in her home with her cats who were not "looking good now." (*Id.*) A.O.'s car was brought to a local body shop, and the mechanics who serviced it experienced irritation to their skin from the chemicals on the vehicle. (*Id.*) The acid caused discoloration, rust, and such significant damage that A.O.'s car was declared to be totaled. (*Id.*) The mechanics also discovered two GPS trackers on the undercarriage of A.O.'s car and another tracker on her fiancé's car, which were registered to Defendant. (*Id.*)

6. In addition to traveling from Virginia to Pennsylvania to stalk A.O., the Government alleges that Defendant also created a fake social media account for A.O., fake e-mails using the victim's identifiers, and sent emails and texts to A.O. from March through September 2024. (*Id.*) What began as rambling insults escalated to specific threats against A.O.'s life and the lives of others. (*Id.*) On May 15, 2024, A.O. warned Defendant that she was reporting him to the police, but the threatening messages from Defendant did not stop. (*Id.*) And when A.O. blocked Defendant's number, he created a new phone number and resumed his barrage of terrorizing messages. (*Id.*) For example, on September 3, 2024, Defendant sent A.O. the following messages:

- The real suffering will start soon. You won't be surviving.
  Figured I'd be blunt since you're a man now.

- It shouldn't have been so easy for you to hurt me with such extreme indifference. I'm gonna hurt you so much worse now. You earned this. There is no way out.

- Everyone around you dies

(*Id.* at 6–7.)  Two days later, Defendant sent the victim the followings texts:

- It shouldn't have been so easy for you to hurt me with such extreme indifference. I'm gonna hurt you so much worse now. You earned this. There is no way out.

- Everyone around you dies.

- Ur time is up. Only way to stop is suicide. You won't do that, so you're gonna be killed slowly.

- Hey there cunt. I have to give phone back so this is it. I sent the 17 sms to trick GPS to that's enough. I wanna tell you a secret though. I don't care about the list. I'm jumping right to you and I'm gonna enjoy it. You don't get to do what you did and live on. Hahahaha. I'll see you soon bitch. Everyone around you dies

(*Id.* at 7.)

7. On September 9, 2024, law enforcement executed a search warrant at Defendant's home in Herndon, Virginia. (*Id.*) Law enforcement seized a shotgun, two rifles, two silencers,[2] two handguns, and six handgun lowers from his home.[3] (*Id.*) They also found numerous types of chemicals, including sulfuric acid,[4] and seized several cell phones and other electronic devices. (*Id.* at 8.) Through the seized devices and Defendant's internet account, law enforcement accessed the email addresses that Defendant created to harass A.O. (*Id.* at 8–9.) Plus, law enforcement seized a number of hotel receipts and records that showed Defendant had

---

[2] On March 19, 2025, the Eastern District of Virginia issued a federal arrest warrant charging Defendant with possessing two unregistered silencers, in violation of 26 U.S.C. § 5861(d). (*Id.* at 7.)

[3] The .223 round of ammunition left on A.O.'s car windshield is consistent with at least one of the firearms found at Defendant's residence. (*Id.* at 7.)

[4] "Alcohol, Tobacco, Firearm, and Explosives (ATF) Special Agent and Bomb Technician Steven Letteney observed many labeled chemicals and electronic parts that could be a precursor for explosives and/or explosive devices, if used by someone with the necessary knowledge." (*Id.* at 8.)

driven his rental cars in and around A.O.'s city of residence when her home and car were vandalized.  (*Id.* at 9.)

### B.     Defendant's Background

1.  Since approximately April 2018, Defendant had lived by himself in a home that he owns in Herndon, Virginia.  (April 7, 2025, Pretrial Services Report ("PTSR") at 1.)  Defendant represented that he has substantial family ties in the Virginia area, including his sister, with whom he maintains regular communication and who was able to verify information for the Pretrial Services Officer.  (*Id.* at 2–4.)  Defendant is not married and has no children.  (*Id.* at 1.)  Though he has no criminal convictions, Defendant has some limited prior contact with the criminal justice system, including the domestic violence incident in which A.O. was injured.[5]  (*Id.* at 14–15.)

2.  At the time of the criminal conduct alleged in the indictment, Defendant worked at Lockheed Martin as a "Cyber Intelligence Analyst Manager."  (Doc. No. 23 at 9.)  In this role, he solved complex problems related to "computer network defense . . . and computer forensics," and he detected, alerted, and responded to "malicious network activity originating from external and internal threat actors."  (*Id.*)  Defendant worked for Lockheed Martin for over 20 years.[6]  (*Id.* at 32–33.)  At times in 2024, Defendant would travel to Lockheed Martin's office in King of Prussia, Pennsylvania.  (*Id.*)

---

[5] On December 13, 2024, it appears that Defendant was arrested by the Camden Police Department and charged with simple assault.  (PTSR at 3.)  This case was dismissed on February 14, 2025.  (*Id.*)

[6] Defendant reported to Pretrial Services that he earned $245,000 annually at the time of his arrest and had a net worth of over $1,200,000.00.  (PTSR at 2.)

   3. Defendant is a sophisticated user of cyber tools. (*Id.*) The Government alleges that in order to facilitate his criminal conduct in this case, Defendant used a paid subscription mobile application ("app") that collects data on WiFi access points, which in turn could be used to hack another person's WiFi network. (*Id.*) Based on a forensic analysis of one of the seized devices from Defendant's home, law enforcement discovered that Defendant had used this app in A.O.'s neighborhood. (*Id.* at 9–10.) The app revealed that Defendant signed up using a fake email address under A.O.'s name and made his username A.O.'s name. (*Id.* at 10.) He also used anti-detect and anti-forensic tools, which concealed his internet activity and blocked metadata. (*Id.*) Last, Defendant had a password cracking tool called "Hashcat" on multiple electronic devices. (*Id.*)

   4. A.O. reported Defendant's threats and harassment to local law enforcement and in late August 2024, Defendant was charged in Bucks County, Pennsylvania for criminal mischief, terroristic threats, stalking, and harassment. (Doc. No. 18 at 2.) He voluntarily surrendered himself at the Central Bucks Police station soon thereafter. (*Id.*) In September 2024, as part of negotiations between the Commonwealth and Defendant's counsel, Defendant was released on bail with certain conditions. (*Id.*) Defendant was placed on a GPS unit and ordered to attend an in-patient mental health treatment program.[7] (*Id.*) Additionally, Defendant was ordered to have no contact with A.O. and her family. (Doc. No. 23 at 2.)

---

[7] Though Defendant's medical records were not provided, defense counsel stated during the hearing on May 20, 2025, that Defendant was diagnosed with depression, anxiety, and post-traumatic stress disorder while attending the in-patient mental health treatment program. Defendant successfully completed the in-patient mental health treatment program and returned to his home in Virginia with GPS monitoring. (Doc. No. 18 at 3.) In Virginia, Defendant continued to work with a therapist. (*Id.*)

Defendant also reported to Pretrial Services that he has a history of alcohol dependance and attends Alcoholics Anonymous classes to address his addiction concerns. (PTSR at 3.)

  5. On February 20, 2025, Bucks County Pre-Trial Services filed a petition to revoke Defendant's bail because A.O. had received an email from steve.kyle@gmail.com, which said "I'm ready to engage. What is going on? Please ping." (*Id.* at 20.) A state judge signed an arrest warrant for Defendant on February 28, 2025, and Defendant was arrested at his home in Virginia that same day. (*Id.* at 3.)

## II.  LEGAL STANDARD[8]

The Bail Reform Act, 18 U.S.C. § 3142(f)(2)(B), governs the reopening of detention hearings. *See United States v. Johnson*, No. 4:16-cr-000019-18, 2016 WL 7042973 (M.D. Pa. Apr. 19, 2016); *United States v. McIntyre*, No. 16-cr-14, 2018 WL 385034 at *1 (D.N.J. Jan. 10, 2018) ("The Bail Reform Act contains what amounts to its own reconsideration provision"); *United States v. Church*, No. 91-cr-476-01, 1991 WL 270100, at *2 (E.D. Pa. Nov. 29, 1991) ("[T]hus upon proper motion, the Court could, after the return of a superseding indictment or any other time that the circumstances warrant, reconsider its original order of detention.").

---

[8] Defendant does not specify under which Local or Federal Rule, or statute, he seeks relief. The Government's opposition brief construes Defendant's motion as one brought under 18 U.S.C. § 3142(f)(2) of the Bail Reform Act. As such, the Court analyzes Defendant's motion as one brought under 18 U.S.C. § 3142(f)(2). *See, e.g., United States v. Corbitt*, No. 1:20-cr-00030, 2020 WL 2098271 (M.D. Pa. May 1, 2020) ("Although Corbitt does not specifically mention 18 U.S.C. § 3142(f) in his motion or brief, the United States construed Corbitt's motion as brought, in part, under 3142(f) . . . . Thus, we construe Corbitt's motion, in part, as a motion to reopen his detention hearing pursuant to 18 U.S.C. § 3142(f).").

And, even if the Court construed Defendant's motion pursuant to Federal Rule of Civil Procedure 59(e)'s "extraordinary circumstances" reconsideration standard, the result would be the same. *See In re Pharmacy Benefit Managers Antitrust Litigation*, 582 F.3d 432, 439 (3d Cir. 2009) (explaining that the extraordinary circumstances in which "a court [is not prohibited] from revisiting its own decisions or one of a coordinate court [are:] where (1) new evidence is available or (2) a supervening new law has been announced . . . [or, (3)] it appears that a previous ruling, even if unambiguous, might lead to an unjust result.") (internal citations omitted). Defendant does not present any new evidence or raise any supervening new law that leads to an unjust result here. Under either standard, the Court finds Defendant fails to rebut the Court's findings of fact that there is no condition or combination of conditions of Defendant's release that will ensure the safety of the community.

>Pursuant to 18 U.S.C. § 3142(f)(2)(B), a prior ruling of detention may be reopened:
>
>>at any time before trial if the judicial officer finds that information exists that was **not known** to the movant at the time of the hearing and that has a **material bearing** on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

*Id.* (emphases added.) As the Act states, a defendant must proffer new information that: (1) was "not known" at the time of the Court's first ruling and (2) is "material." *McIntyre*, 2018 WL 385034, at *1. "Furthermore, even if a defendant submits new information that is material, the statute's 'use of the word 'may' indicates discretion on the part of the district court. Thus, there is no requirement to reopen a detention hearing.'" *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. 2012); *see also Church*, 1991 WL 270100, at *2 ("[T]here is no requirement in the Bail Reform Act that the Government move and for the Court repeat an evidentiary hearing on pretrial detention each time."). "Courts have interpreted [18 U.S.C. § 3142(f)(2)(B)] strictly, holding that hearings should NOT be reopened if the evidence was available at the time of the hearing." *United States v. Merola*, No. 08-cr-327, 2008 WL 4449624, at *2 (D.N.J. Sept. 30, 2008) (capitalization in original). Reconsideration is an "extraordinary remedy," to be granted "sparingly." *NL Indus. Inc. v. Commercial Union Ins. Co.*, 935 F. Supp. 513, 516 (D.N.J. 1996).

### III.    DISCUSSION

The Court's prior May 28, 2025, Memorandum discussed at length the Bail Reform Act factors, including the nature and circumstances of the offenses charges; the weight of the evidence against Defendant; his history and characteristics; Defendant's prior violation of a state court's order; the nature and seriousness of the danger to any person or the community posed by Defendant's release; and the risk that Defendant might not appear for trial. (*See*

Case 2:25-cr-00122-KSM   Document 42   Filed 01/05/26   Page 10 of 14

*generally* Doc. No. 29.)  Despite the Court's prior findings, Defendant now raises several challenges that he claims warrant the Court's reconsideration of his continued detention.

First, Defendant argues that his detention hinders his ability to assist in his own defense because he is unable to access the law library and has limited phone usage.  Defendant also claims there have been issues with his medication that have contributed to his lack of focus when reviewing discovery with his counsel.  (Doc. No. 40 at 2.)  Second, Defendant argues the Court mistakenly relied on the Government's inaccurate description of 2004 incident between Defendant and A.O.  (*Id*.)  Third, Defendant claims that the Court should not have found that his specialized knowledge of cybersecurity and technology weighed in favor of detention.  (*Id.* at 3.)  Fourth, Defendant contends that the Court should have considered the fact he was denied his right to a bail hearing in state court.  (*Id.* at 4.)  And, last, Defendant argues that his release is appropriate because he claims there are less restrictive conditions that the Court could impose which would reasonably assure the safety of A.O., her family, and the community generally. (*Id.* at 8.)  The Court addresses each argument in turn.

### *Access to Discovery*

First, Defendant argues that his detention hinders his ability to assist in his own defense because he is unable to have meaningful access research or review discovery while incarcerated. (*Id.* at 2.)  Defendant argues that prior to being detained he conducted "countless hours" of legal research and saved many documents to a Microsoft one drive, which he cannot access while detained.[9]  Additionally, Defendant argues the discovery in his case is voluminous and complex

---

[9] Defendant acknowledges he could provide the password to his legal counsel to access his prior research, yet claims he also has facial recognition in place, so he is the only person able to access the drive with his saved research and documents.  But, as the Government notes, Defendant is not an attorney, and he is ably represented by seasoned defense attorneys who are able to conduct any research needed for his case.

and a protective order prohibits Defendant from being able to keep copies of discovery for independent review. But these arguments do not constitute *new* information. All detained defendants must assist with their defense and work within the limits of pretrial detention. Many detained defendants must review voluminous, complex discovery while a protective order is in place.[10] In response, the Government represents that counsel for the Federal Detention Center ("FDC") confirmed that Defendant is housed in a unit that has access to the law library computers and the telephone and Defendant's unit team will arrange any requests for legal calls.

Defendant also asserts there have been issues with his medication that have contributed to his lack of focus when reviewing discovery with his counsel. (Doc. No. 40 at 2.) But the Government reports that the FDC explained that the only issue is that Defendant requested to be treated with a non-formulary medication, and the FDC instead is treating him with a formulary substitute. (Doc. No. 41 at 7.) The Court will not second guess the determination by the FDC's medical unit related to the treatment of Defendant.

There is no doubt that it would be easier for both Defendant and his counsel to work on his defense if Defendant was not detained. But, there is not anything unique or new about Defendant's situation here. *See United States v. Villegas*, No. 2:19-cr-568, 2020 WL 1649520, at *2 (C.D. Cal. Apr. 3, 2020) ("[T]here is nothing unique about his situation—as opposed to all detained defendants who must assist in their defense within the limits of pretrial custody—that would make temporary release for trial preparations 'necessary' here."); *see also Corbitt*, 2020 WL 2098271, at *8 ("Corbitt has not shown that the COVID-19 pandemic is a compelling reason for his release or that his release is necessary for the preparation of his defense.")

---

[10] Even if the Court were to order Defendant released, the Court's protective order would still prevent Defendant from "retaining any copies of discovery for independent and ongoing review." (Doc. No. 40 at 2.)

Defendant has access to his counsel and discovery and must work within the limits of pretrial detention to assist his counsel with the defense of his case.

### *2004 Incident between Defendant and A.O.*

Next, Defendant contends that the Court's May 28, 2025, Memorandum relied upon the Government's mischaracterization of the 2004 incident between Defendant and A.O. Defendant argues that the Government's description of this incident as domestic violence with Defendant as the aggressor is not accurate. However, as the Government correctly points out, in prior hearings, Defendant made similar arguments and presented his explanations for the 2004 incident. (Doc. No. 41 at 8.) Motions for reconsideration "may not be used to rehash arguments which have already been briefed by the parties and decided by the Court." *PBI Performance Prods., Inc. v. NorFab Corp.*, 514 F. Supp. 2d 732, 743–44 (E.D. Pa. 2007) (citation omitted). And, even so, "whether the defendant *believes* that the victim wronged him in 2004 is entirely immaterial to the issue of whether he is a danger to the victim and the community based on the instant indicted conduct." (Doc. No. 41 at 8 (emphasis added).)

### *Specialized Knowledge*

Defendant disagrees with the Court's prior consideration of Defendant's specialized knowledge of cybersecurity and technology when considering whether Defendant posed a danger to the community. (Doc. No. 40 at 3.) But Defendant has not shown that the Court made any error in its prior determination. The Government alleges that Defendant used his specialized knowledge of cybersecurity and technology "to stalk, cyberstalk, and threaten A.O, including driving to her house to collect data from her WiFi network." (Doc. No. 41 at 5.) The cyberstalking allegations include Defendant's use of multiple trackers on A.O. and her fiancé's vehicles. The Court's determination that Defendant possesses specialized knowledge of

cybersecurity and technology which appears to have been used to stalk, cyberstalk and threaten A.O. and her family, and supports the contention that Defendant poses a threat to her and the community, still stands.

### *State Bail Hearing*

Defendant contends that his due process rights were violated when he was "denied his right to a bail violation hearing" in state court. (Doc. No. 40 at 4.) Yet again, as the Government correctly points out, "these same arguments were presented at the defendant's earlier detention proceedings before both Magistrate Judge Wells and this Court, and, as such, wholly fail to meet the defendant's legal burden of providing any new or material information which would permit further review of his Motion under Section 3142(f)." (Doc. No. 41 at 8.) Moreover, as the Government notes, "[w]hether a state judge found the defendant had violated his state bail condition is inconsequential as this <u>federal</u> court found that he had done so." (*Id.* (emphasis added).) The Court will not entertain this argument anew.

### *Less Restrictive Conditions*

Defendant points to the 18 U.S.C. § 3141(g) factors to argue that there are less restrictive conditions than total confinement that could reasonably assure the safety of A.O., her family, and the community generally. (Doc. No. 40 at 8.) Specifically, Defendant claims electronic monitoring would ensure that Defendant is not in the vicinity of A.O. and her family. The Court disagrees. The Court previously analyzed the factors in detail and concluded that no condition or combination of conditions of Defendant's release will ensure the safety of the community. (*See* Doc. No. 29.) Nothing in Defendant's motion to reconsider changes this conclusion.

* * *

For these reasons, and incorporating the findings and analysis set out in the Court's May 28, 2025, Memorandum in this case, Defendant's motion for reconsideration of detention is denied. An appropriate Order follows.